# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

SCHWING AMERICA, INC.                          Bky Case No. 09-36760
                                               Chapter 11

        Debtor.

## DEBTOR'S MODIFIED DISCLOSURE STATEMENT
### JUNE 1, 2010

## I. INTRODUCTION

### A.      General

Schwing America, Inc. ("Debtor") seeks confirmation from the United States Bankruptcy Court for the District of Minnesota ("Bankruptcy Court") of its Plan of Reorganization dated April 26, 2010 ("Plan"). A copy of the Plan accompanies this Disclosure Statement (the "Disclosure Statement").

This Disclosure Statement is furnished pursuant to Section 1125 of the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.* (the "Code") and is intended to provide all persons who have claims against the Debtor or its property with information sufficient to permit them to make an informed judgment as to their votes to accept or reject the Plan. The information set forth in this Disclosure Statement has been supplied by the Debtor.

This Disclosure Statement and the enclosed Plan should be read in their entirety. It may also be advisable for creditors to consult their own counsel or other advisors with respect to matters related to the Plan. For the convenience of creditors the terms of the Plan are summarized in this Disclosure Statement in Section IV entitled "Summary of the Plan". However, all summaries are qualified by the Plan itself, which is controlling in the event of any inconsistency.

Any capitalized terms contained herein which are not specifically defined herein shall have the meaning provided for in the Plan unless the context otherwise requires.

### B.      Representations

No representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made to secure acceptance of the Plan which are other than as contained in this Disclosure Statement should not be relied upon by creditors in arriving at a decision to vote to accept or reject the Plan.

The information contained herein is not audited. The Debtor is unable to warrant or represent that the information contained herein is without any inaccuracy, although the Debtor has made every reasonable effort to be accurate in all material respects. Ravich Meyer Kirkman McGrath Nauman & Tansey, counsel for the Debtor, have not verified any of the information set forth in this Disclosure Statement. Ravich Meyer Kirkman McGrath Nauman & Tansey has no actual knowledge of any inaccuracies.

## II.  HISTORY OF THE DEBTOR

Schwing America, Inc. ("SAI" or "Debtor"), a Minnesota corporation is headquartered at 5900 Centerville Road, St. Paul, Minnesota. SAI is a wholly owned subsidiary of Schwing GmbH, a German corporation. Schwing GmbH was founded over 75 years ago and Schwing America has been in existence for over 40 years.

SAI is engaged in the manufacture, sale and support of the following products within Canada, the United States, Mexico and Central America under the brand names of "Schwing" or "Stetter":

- o  Truck mounted concrete pumps both with and without placing booms
- o  Truck mixers
- o  Trailer mounted concrete pumps without a boom (Global producer for the Schwing Group)
- o  Separate placing booms
- o  Aftermarket parts to support all of these products
- o  Ready mix reclaimers

Schwing is viewed as the premier brand of concrete pumps in the world. Schwing Group purchased the Stetter Company as its entry into the truck mixer business. The Stetter brand has a strong following in Europe and Asia and is gaining momentum in North America.

The headquarters of SAI is situated on 40+ acres of land in the northeast part of the Twin Cities of Minneapolis and St. Paul. SAI has full engineering, sales, service, welding, manufacturing, painting, parts distribution, call center and required administrative functions located at this facility.

SAI's customer base is involved in residential, commercial, public and infrastructure construction which is cyclical in nature. Customer types include general contractors, concrete contractors, concrete pump rental fleets, foundation contractors and ready mix suppliers.

Since its founding in America in the early 1970's, SAI has been the market leader for concrete pumps in terms of market share, quality and after sale support. During this time the Debtor has positioned itself as the premium supplier of concrete pumps selling at the strongest prices in our market. While SAI has the ability to fully manufacture its products, its concrete pump competitors do not manufacture the product in America but simply assemble major components sourced from outside countries. The lower cost basis associated with assembly allows these competitors to sell at cheaper prices than SAI. The entry of competitors from China and Korea has put downward pressure on prices in this market. SAI is undertaking several cost reduction initiatives to reduce costs and maintain margins in a downward pricing environment.

In 2008-9, the Debtor experienced a substantial reduction in sales. Unable to reduce operating cost commensurately, the Debtor lost a substantial amount of money during that time. SAI received substantial financial support from Schwing GmbH during this period but nonetheless was unable to comply with the terms of the agreements pertaining to its secured debt. After failing to reach agreement with its lenders on an adequate forbearance agreement, SAI filed the petition commencing this case on September 28, 2009.

## III. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

**3.1.    First Day Orders.** On or shortly after the Petition Date, the Bankruptcy Court entered several orders authorizing SAI to pay various prepetition claims and granting other relief necessary to help SAI stabilize its day-to-day business operations. These orders were designed to allow SAI to continue business operations with minimum disruptions and dislocations, and to ease the strain on its relationships with its employees and other parties. Included among the orders entered by the Bankruptcy Court were orders authorizing SAI to pay wages, salaries, employment taxes, employee benefit payments, and workers compensation payments.

**3.2.    Appointment of Committee.** On October 8, 2009, the Office of the United States Trustee (the "**U.S. Trustee**") filed the Appointment of Committee of Unsecured Creditors in the SAI case. The Committee is comprised of Paul O'Brien for the Kolstad Company, Inc., Mark Junkersfeld for Saga Advertising & Marketing, Inc., and Terry Skebba for Construction Forms, Inc. The Committee engaged Thomas Flynn of Larkin Hoffman Daly & Lindgren Ltd. to represent it as counsel.

**3.3.    Bar Dates for Filing Proofs of Claim.** The Bankruptcy Court set a deadline of February 22, 2010 for holders of Claims other than Governmental Units to file proofs of claim. March 29, 2010 was set as the deadline for Governmental Units to file proofs of claim.

**3.4.    Use of Cash Collateral.** Upon motion by the Debtor, the Bankruptcy Court has from time to time during the case entered orders permitting the use of cash collateral by the Debtor. All of the Debtor's assets, including cash collateral, are subject to a first-priority security interest securing payment of the Debtor's obligations to its lenders, Wells Fargo Bank, National Association and Bank of America (the "Lenders"). The use of cash collateral has permitted the Debtor to pay its operating expenses during this case. In addition, the Debtor's parent, Schwing GmbH, has loaned $1 million to the Debtor to provide additional working capital. That loan will be repaid on the Effective Date under the terms of the Plan.

**3.5.    Cost Reductions.** During the case, the Debtor completed substantial operational changes which are designed to enable the refinancing, reduce operating costs and streamline the Debtor's day-to-day operations:

>        (a)    The Schwing Group's production array has been changed to allocate production of additional models of large trailer pumps to the Debtor, thereby enhancing its revenue;

>        (b)    The Debtor has consolidated its operations elsewhere in the country to its facility in White Bear Lake, thereby reducing costs significantly;

(c)     The Debtor has laid off an additional 47 employees, reducing its total headcount to 83; and

(d)     The Debtor has shut down its weld shop, machine shop and paint shop, intending to outsource those functions thereby reducing costs further.

**3.6.     Rejection of Real Property Leases.**  From the Petition Date to January 26, 2010, the Debtor had the authority to assume or reject leases of real property under section 365(a) of the Bankruptcy Code subject to Bankruptcy Court approval.  During the case, the Debtor rejected leases associated with its business locations in Livermore and Mira Loma, California, Atlanta, Georgia, and Tampa, Florida.  The Debtor vacated all of those locations by December 31, 2009.

**3.7     Financial Results.**  Financial statements of the Debtor for 2008 and 2009 are attached hereto as **Exhibit 1.**  Year-to-date results for 2010 in included in **Exhibit 3.**

## IV. SUMMARY OF THE PLAN AND MEANS FOR ITS EXECUTION

**4.1.     Summary.**  After confirmation of the Plan, Debtor will continue to operate its business in the ordinary course.  Payments required by the Plan will be made from the cash flow generated by the operation of that business.  The Plan provides for the refinancing of the Debtor's obligations to its Lenders by way of a new loan from its parent, Schwing GmbH.  That loan will be facilitated by a loan of approximately $22 million to the parent from a consortium of European Banks which presently provide financing to the Debtor's parent.  That loan is expected to close on the Effective Date of the Plan.  In turn, the Debtor's parent will loan the $22 million to the Debtor on the terms described on attached **Exhibit 2.**

**4.2.     Feasibility of the Plan.**  SAI has completed its 2010-12 business plan and related projections.  A copy of the projection of the Debtor's financial statements prepared according to GAAP,  is attached hereto as **Exhibit 3**.  In addition, the last pages of **Exhibit 3** contain a cash flow projection showing the payment of obligations to creditors under the Plan.  The projections demonstrate that the Debtors will be profitable and capable of performing their obligations under the Plan.

**4.3.     Governance of the Reorganized Debtor.**  The board of directors of SAI shall consist of the following members:

Gerhard Schwing (CEO of Schwing GmbH) – Chairman of the Board
Achim (Mike) Schroeder (V.P. of Logistics of Schwing GmbH) – Vice Chairman
Brian Hazelton – Board Member
Brian Mogensen – Board Member
Heinz Wortmann – Board Member
Bill Dease – Board Member

**4.4.     Management of the Reorganized Debtor.**  Management of SAI shall consist of:

Brian Hazelton – Chief Executive Officer (annual compensation: $420,000)
Brian Mogensen – Chief Financial Officer (annual compensation: $200,000)
Heinz Wortmann- Vice President of Operations (annual compensation: $180,000)

Bill Dease – Vice President of Human Resources (annual compensation: $145,000)

## V. TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

**5.1.    Administrative Claims.**  Each holder of an allowed Administrative Claim (except any such holder that agrees to different treatment) shall receive the full amount of such claim, in cash, on the Distribution Date; provided, however, that allowed Administrative Claims representing (a) postpetition liabilities incurred in the ordinary course of business by the Debtor and (b) postpetition contractual liabilities arising under loans or advances to the Debtor, whether or not incurred in the ordinary course of business, shall be paid by the Reorganized Debtor in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements relating thereto.  Administrative Claims to be paid on the Effective Date include the $1 million loan made to the Debtor's by Schwing GmbH during the case.

**5.2.    Priority Tax Claims.**  The Debtor believes there are no such claims.  Each Allowed Priority Tax Claim, if any, will be paid in full, in cash, either (i) on the Effective Date (or as soon thereafter as is practicable after any such Claim is allowed) or (ii) at the Debtors' option, in equal quarterly payments over a period not exceeding five years after the date of the order for relief entered against any Debtor in accordance with Bankruptcy Code section 1129(a)(9)(C), together with interest at the rate set by applicable non bankruptcy law from the Effective Date to the Distribution Date.

**5.3.    United States Trustee Fees.**  Fees payable by Debtor under 28 U.S.C. § 1930 will be paid in full on the Effective Date.  In addition, following confirmation, the Debtor will timely pay all fees incurred pursuant to 28 U.S.C. §§1930(a)(6) and will file with the Court and serve on the U.S. Trustee a monthly financial report in the prescribed format, for each month or part thereof that the Case remains open.

**5.4.    Class 1 – Priority Non-Tax Claims.**  Class 1 consists of all Priority Non-Tax Claims.

**Treatment**.  The Debtor has no Priority Non-Tax Claims except accrued and unused vacation pay of approximately $554,355.  All holders of such claims who remain employees of the Debtor will receive payment by continuing to receive such vacation pay in the ordinary course of business.  To the extent that such holders are not longer employed by Debtor, each holder of a Priority Non-Tax Claim against Debtor shall receive on the Distribution Date (i) the amount of such holder's Allowed Claim in one cash payment, not to exceed $10,950 in the case of wages, salaries and commissions; or (ii) such other treatment as may be agreed upon in writing by Debtor and such holder. The amount of this payment will be approximately $284,690.

**5.5.    Class 2 – Secured Claims.**  Class 2 consists of Secured Claims as follows:

**2A – Wells Fargo Bank, N.A. and Bank of America**.  The Class 2A claim is in the principal amount of $21,582,428.57.  The Class 2A claim will be paid in full on or before the Effective Date.  Until paid Wells Fargo shall retain all of its liens and all rights and claims under its loan documents and under all cash collateral orders entered by the

bankruptcy court. No other payments will be made under the Plan until the Class 2A claim is paid in full.

**2B – De Lage Landen Financial**. The principal amount of this claim is $22,079.52. Commencing on the Effective Date, the Debtor shall make monthly payments of $3,128.67 until the Class 2B claim is paid in full. The interest rate and other terms of the documents governing the Class 2B claim shall remain unchanged except as provided in the Plan.

**2C – Nuss Truck Group, Inc.** Upon the sale of any chassis included among the collateral of the Class 2C claim, the holder of that claim will be paid the purchase price for that chassis in the amount set out on **Schedule 2C** to the Plan. The holder of the Class 2C claim shall retain its security interest in the chassis in the same priority and manner as existed on the Petition Date.

**5.6. Class 3 – Convenience Class Claims.** Class 3 consists of all Convenience Class Claims which are unsecured claims that are filed or scheduled in the amount of $500 or less, or reduced by the holder of such unsecured claim to $500 by election on the ballot.

**Treatment.** Class 3 Claims total approximately $33,000. Each holder of an Allowed Convenience Claim shall receive on the Effective Date, or as soon thereafter as is practicable, in full and complete satisfaction, settlement and release of and in exchange for such allowed Convenience Claim cash equal to 100% of such Allowed Convenience Claim.

**5.7. Class 4 – General Unsecured Claims**. Class 4 consists of all General Unsecured Claims totaling approximately $8.7 million.

**Treatment**. In full satisfaction of each Class 4 claim, the holder shall receive 100% of the allowed amount of the claim, without interest, payable over 24 months in equal monthly installments commencing on the Effective Date and then on the same day of each succeeding month until paid in full. In the event any payment is not made when due, any holder of a Class 4 claim may give the Reorganized Debtor written notice of such failure to pay. If payment is not made within ten (10) business days of the date such notice is sent, the entire remaining balance of the Class 4 claim held by that holder shall be due and payable. Each quarterly installment will total approximately $1,087,500.

**5.8. Class 5 – Insider Unsecured Claims**. Class 5 consists of all Insider Unsecured Claims totally approximately $52.6 million.

**Treatment**. Effective upon the full payment of the Class 2A claim, payment of the Class 5 claims shall be subordinate and occur after payment of the Class 3 and 4 claims. The terms of repayment of the Class 5 claims will be determined based on the Debtor's cash flow after the Class 3 and 4 claims are paid in full.

**5.9. Class 6 – Equity Interests**. Class 6 consists of all Equity Interests.

**Treatment**.  All Class 6 equity interests in Debtor shall remain in place and continue to be held by the holder thereof.

## VI.  ALTERNATIVES TO THE PLAN

The only meaningful alternative to the Plan is a conversion to a chapter 7 liquidation under the Bankruptcy Code.  Attached as **Exhibit 4** is Debtor's analysis of the treatment of its creditors in a Chapter 7 case.  The treatment provided by the Plan is substantially better for all creditors.

## VII. TAX CONSEQUENCES

The Debtor is not qualified to advise creditors of the specific respective tax impact on each of them as a result of treatment provided in the Plan and therefore makes no representation as to that.  While the Debtor does not believe the Plan will have a tax impact on claim holders, each creditor is urged to consult with a tax advisor as to such matters.

The Debtor is not expected to suffer adverse tax consequences as a result of the Plan. The Debtor has incurred tax losses in past years which are expected to carry forward to eliminate any taxes payable as the result of confirmation.  The Debtor may incur liability for income tax on debt forgiven as the result of confirmation, but Debtor's tax attributes are expected to eliminate that tax.

## VIII.  CONCLUSION

It is important that creditors exercise their rights to vote for the acceptance or rejection of the Plan.  Debtor requests that each holder of a Claim in each class complete the ballot and vote to accept the proposed Plan.


Dated:  June 1, 2010                                      SCHWING AMERICA, INC.


                                                         By_____
                                                            Brian Hazelton
                                                            Chief Executive Officer

**Schwing America Inc.**
Income Statement - Forecast
**FY 2008 - 2009**

# EXHIBIT 1

| | | 2008 | | | 2009 | |
|---|---|---:|---:|---|---:|---:|
| | 1500 BPA | $ 24,288,421 | | $ | 6,327,758 | |
| | 2000 BPL | 96,736,537 | | | 30,537,637 | |
| | 3000 Mixers | 3,331,845 | | | 1,306,820 | |
| | 3500 Parts | 34,524,707 | | | 18,413,419 | |
| | 4500 Service | 1,949,433 | | | 1,005,655 | |
| | 5000 Warranty | (2,163,382) | | | (678,741) | |
| | 5500 SPB | 6,603,121 | | | 1,206,686 | |
| | 6000 Training | 70,903 | | | 31,385 | |
| | 6500 Trucks | 7,163,461 | | | 1,672,149 | |
| | 7000 Used Equip. | 14,293,167 | | | 6,142,533 | |
| | 7500 Miscellaneous | 4,661,250 | | | 1,629,437 | |
| * | Gross Sales | $ 191,459,463 | 228.2% | $ | 67,594,738 | 80.6% |
| | 1500 BPA | $ 27,084 | 0.0% | $ | 36,129 | 0.0% |
| | 2000 BPL | 929,619 | 1.0% | | 646,479 | 2.2% |
| | 3000 Mixers | 4,422 | 0.0% | | 5,030 | 0.0% |
| | 3500 Parts | 6,368,921 | 18.4% | | 3,761,059 | 20.4% |
| | 4500 Service | 155,528 | 8.0% | | 204,957 | 20.4% |
| | 5000 Warranty | 574,935 | -26.6% | | 224,856 | -33.1% |
| | 5500 SPB | 5,503 | 0.0% | | 74,860 | 0.1% |
| | 6000 Training | 750 | 0.0% | | (2,540) | 0.0% |
| | 6500 Trucks | - | | | 30,975 | 0.0% |
| | 7000 Used Equipment | 2,092 | | | | |
| | 7500 Miscellaneous | 89,172 | 0.11% | | 36,806 | 0.04% |
| * | Sales Deductions | $ 8,158,026 | 9.7% | $ | 5,018,611 | 6.0% |
| | 1500 BPA | 24,261,337 | 28.9% | | 6,291,629 | 7.5% |
| | 2000 BPL | 95,806,918 | 114.2% | | 29,891,158 | 35.6% |
| | 3000 Mixers | 3,327,423 | 4.0% | | 1,301,790 | 1.6% |
| | 3500 Parts | 28,155,786 | 33.6% | | 14,652,360 | 17.5% |
| | 4500 Service | 1,793,905 | 2.1% | | 800,698 | 1.0% |
| | 5000 Warranty | (2,738,317) | -3.3% | | (903,597) | -1.1% |
| | 5500 SPB | 6,597,618 | 7.9% | | 1,131,826 | 1.3% |
| | 6000 Training | 70,153 | 0.1% | | 33,925 | 0.0% |
| | 6500 Trucks | 7,163,461 | 8.5% | | 1,641,174 | 2.0% |
| | 7000 Used Equip. | 14,291,075 | 17.0% | | 6,142,533 | 7.3% |
| | 7500 Miscellaneous | 4,572,078 | 5.4% | | 1,592,631 | 1.9% |
| ** | Net Sales | $ 183,301,437 | 218.4% | $ | 62,576,127 | 74.6% |
| | Net Labor & Overhead | 3,494,449 | 2.7% | | 5,490,705 | 13.9% |
| * | Direct COGS | $ 3,494,449 | 10.8% | $ | 5,490,705 | 9.0% |
| | | | Margin % | | | Margin % |
| | BPA | $ 19,358,071 | | $ | 5,176,177 | |
| | BPL | 84,272,750 | | | 28,130,689 | |
| | Mixers | 3,454,602 | | | 1,219,690 | |
| | Service | 2,584,922 | | | 1,153,731 | |
| | SPB | 6,054,805 | | | 1,270,608 | |
| | Parts | 17,498,119 | 37.9% | | 8,675,003 | 40.8% |
| | Warranty | (907,672) | 66.9% | | (319,269) | 64.7% |
| | Trucks | 6,000,852 | 16.2% | | 1,503,245 | 8.4% |
| | Used Equipment | 15,361,605 | -7.5% | | 10,354,345 | -68.6% |
| | Miscellaneous | 4,024,558 | 12.0% | | 1,138,717 | 28.5% |
| * | Other COGS | $ 157,702,612 | | $ | 58,302,936 | |
| | Material Variances / Obsolenscence | 1,121,783 | 1.3% | | 3,509,906 | 4.2% |
| ** | Total Cost of Sales | $ 162,318,844 | 193.4% | $ | 67,303,547 | 80.2% |
| *** | Gross Profit | $ 20,982,593 | 25.0% | $ | (4,727,420) | -5.6% |
| | ** SG&A ** | | | | | |
| | SAI Wages Salaried | 9,417,969 | 5.1% | | 6,293,123 | 10.1% |
| | SAI Wages Hourly | 3,703,467 | 2.0% | | 1,962,915 | 3.1% |
| | SAI Taxes & Benefits | 2,385,989 | 1.3% | | 1,566,827 | 2.5% |
| | SAI WC/401K | 581,892 | 0.3% | | 154,501 | 0.2% |
| | SAI Other Spending | 22,116,254 | 12.1% | | 12,518,584 | 20.0% |
| | SAI SGA Savings | - | | | | |
| | SAI Internal Costs | (3,941,290) | -2.2% | | (2,594,727) | -4.1% |
| | Total Non Headcount Spending | 18,174,964 | 9.9% | | 9,923,857 | 15.9% |
| | * Total SG&A | $ 34,264,281 | 18.7% | $ | 19,901,223 | 31.8% |
| **** | Income from Opns | $ (13,281,688) | -15.8% | $ | (24,628,643) | -29.4% |
| | Other Income/Expense INTERCO INTEREST | $ 1,670,863 | 2.0% | $ | 4,542,445 | 5.4% |
| | DEBT SERVICE | | | | | |
| | UNREALIZED CURRENCY (GAIN) LOSS & OTHER | | | | | |
| ***** | Income B/Tax | $ (14,952,551) | -17.8% | $ | (29,171,088) | -34.8% |
| | Income Tax Expense | $ 1,929,827 | 2.3% | $ | 106,043 | 0.1% |
| ****** | Net Income | $ (16,882,378) | -20.1% | $ | (29,277,131) | -34.9% |

# Schwing America, Inc. and Subsidiaries

2008 - 2009 Balance Sheet

|  | | 2008 | | 2009 |
|---|---|---:|---|---:|
| **Assets** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ | 1,278,894 | $ | 6,434,368 |
|  | | | | |
| Accounts Receivable - Trade | | 1,776,644 | | 1,548,187 |
| Accounts Receivable - Affiliates | | 3,703,434 | | 1,150,954 |
| Accounts Receivable - Related | | 8,934,420 | | 8,284,953 |
| Net, Accounts receivable | | 14,414,499 | | 10,984,094 |
|  | | | | |
| Raw Material | | 30,807,274 | | 23,256,851 |
| WIP | | 45,211,979 | | 15,391,975 |
| Inventory - Finished | | | | 16,462,317 |
| Inventory - Used | | 19,768,589 | | 14,209,170 |
| Inventory | | 95,787,842 | | 69,320,313 |
|  | | | | |
| Prepaid expenses | | 1,054,078 | | 382,900 |
| Other Current Assets | | 2,566,617 | | 1,350,274 |
| **Total Current Assets** | | **115,101,930** | | **88,471,949** |
|  | | | | |
| Property and equipment, net | | 17,210,402 | | 14,917,362 |
| Investments | | - | | - |
| Intangibles, net | | 209,712 | | 187,522 |
| **Total Non Current Assets** | | **17,420,114** | | **15,104,884** |
|  | | | | |
| **Total assets** | $ | **132,522,044** | $ | **103,576,833** |
|  | | | | |
| **Liabilities and Shareholder's Equity** | | | | |
| Current liabilities: | | | | |
| Current Maturities of LTD - WBL | $ | (239,107) | $ | (242,641) |
| Short Term Loans | | | | (27,854,008) |
| Current maturities of long-term debt | | (44,957,937) | | - |
| Accounts payable - trade | | (10,863,336) | | (5,479,718) |
| Accounts payable - affiliates | | (18,054,311) | | (30,262,297) |
| Accounts payable - related | | | | (523,032) |
| Accrued taxes | | | | (689,026) |
| Accrued expenses | | (8,581,517) | | (6,451,365) |
| Deferred revenue | | (1,670,364) | | (613,114) |
| Notes payable to parent | | (20,000,000) | | (22,100,000) |
| Other Current Liabilities | | | | (538,946) |
| **Total Current Liabilities** | $ | **(104,366,572)** | $ | **(94,754,147)** |
|  | | | | |
| Non Current Liabilities | | | | |
| Deferred Tax Liability | | | | - |
| LTD - Other | | (308,214) | | (62,066) |
| Notes payable to parent | | | | - |
| **Total Non Current Liabilities** | $ | **(308,214)** | $ | **(62,066)** |
|  | | | | |
| **Total Liabilities** | $ | **(104,674,786)** | $ | **(94,816,213)** |
|  | | | | |
| Stockholder's equity: | | | | |
| Common stock, no par value. Authorized 2,500 shares; | | | | |
| issued and outstanding 100 shares | | (60,000) | | (60,000) |
| Additional paid-in capital | | (14,655,572) | | (24,655,572) |
|  | | | | |
| Prior Year Retained Earnings | | (30,014,064) | | (4,821,263) |
| Current Year (Profit/Loss | | 16,882,378 | | 20,776,215 |
| Retained earnings | | (13,131,686) | | 15,954,952 |
|  | | | | |
| Total shareholder's equity | | (27,847,258) | | (8,760,620) |
| Commitments and contingencies | | | | |
| **Total liabilities and shareholder's equity** | $ | **(132,522,044)** | $ | **(103,576,833)** |

# Schwing America, Inc. and Subsidiaries

2008 - 2009 Cash Flow Statement

| | **2008** | **2009** |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income | ($16,882,378) | ($29,277,137) |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 2,031,163 | 2,101,707 |
| Deferred income taxes | 4,861,272 | 0 |
| Gain on sale of fixed assets | 17,947 | 137,565 |
| Bad debt expense | 4,046,585 | 625,058 |
| Impairment of intangible assets | 2,051,719 | 0 |
| Change in operating assets and liabilities: | | |
| Accounts receivable | 2,496,242 | 3,956,302 |
| Accounts receivable – affiliates & related | 881,834 | (818,554) |
| Inventory | 1,070,052 | 26,467,530 |
| Income and sales tax refund receivable | (2,566,617) | 2,566,617 |
| Prepaid expenses | (399,897) | 657,083 |
| Cost and estimated earnings in excess of billings | 0 | 0 |
| Other assets | 445,129 | (706,094) |
| Accounts payable – trade | (1,208,601) | (4,860,586) |
| Accounts payable – affiliates | 4,013,471 | 11,433,589 |
| Accrued expenses and Other | (3,608,523) | (938,035) |
| Income taxes payable | 0 | 35,759 |
| Deferred revenue | 746,251 | (1,057,250) |
| Net cash provided by operating activities | ($2,004,351) | $10,323,554 |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (2,593,469) | (170,888) |
| Proceeds from sale of fixed assets | 345,835 | 249,354 |
| Net cash used in investing activities | ($2,247,634) | $78,465 |
| Cash flows from financing activities: | | |
| Proceeds from long or short-term debt | 1,374,403 | 9,600,000 |
| Payment of long or short-term debt | (5,193,888) | (24,267,420) |
| Proceeds (Payment) of notes payable to parent | | 0 |
| Payments of obligations under capital lease | (190,255) | (579,125) |
| Proceeds from Paid in Capital | 0 | 10,000,000 |
| Net cash used in financing activities | ($4,009,740) | ($5,246,545) |
| Net decrease in cash and cash equivalents | (8,261,725) | 5,155,474 |
| Cash and cash equivalents at beginning of year | 9,540,619 | 1,278,893 |
| Cash and cash equivalents at end of year | $1,278,894 | $6,434,368 |

SCHWING GmbH

Postfach 20 03 62
D-44647 Herne
Telefon 0 23 25 / *9 87-0
Telefax 0 23 25 / 7 29 22
E-Mail: info@schwing.de

**SCHWING**

## EXHIBIT 2

Schwing America, Inc.
5900 Centerville Road
White Bear, Minnesota 55127
USA

April 23, 2010
GF/GS-fi

Dear Sirs,

Schwing America, Inc. ("SAI"), a Minnesota corporation, which is a wholly owned subsidiary of Schwing GmbH (the "Company"), is currently being restructured under Chapter 11 of the United States Bankruptcy Code. SAI is in need of additional funding in order to resolve its relationship with certain lenders and also for working capital purposes for ongoing operations.

A consortium of German banks (the "Banks") has informed the Company by a commitment letter dated April 23, 2010 which is attached hereto as Annex I (the "Bank's Commitment Letter") of the Banks' commitment to provide the Company on a secured basis with bilateral term loan facilities in the aggregate amount of EUR 17,000,000 subject to the terms and conditions of the Bank's Commitment Letter (the "Facilities").

The Company, in turn, is pleased to inform SAI of the Company's commitment to provide SAI with a shareholder loan in the principal amount of USD 22,000,000 (the "Shareholder Loan").

Condition Precedent. The Company's commitment hereunder is subject to (i) the disbursement of the Facilities and (ii) the preparation, execution and delivery of a mutually acceptable loan documentation for the Shareholder Loan on terms that enable Schwing GmbH to comply with the terms of the Facilities save for the terms and conditions set out below.

Other terms and conditions.

1. Subject to adjustments by the Company in case of a change of the base interest rate (*Basiszinssatz*), the interest rate shall be 8 per cent per annum, payable monthly in arrears.

2. SAI shall pay to the Company a commitment fee of 3,0 per cent per annum on the available undrawn amount, payable monthly in arrears.

. . .

SCHWING GmbH · Hauptverwaltung und Werk: Heerstraße 9-27 · D-44653 Herne
Amtsgericht Bochum, HRB 9680 · Geschäftsführer: Dipl.-Kfm. Gerhard Schwing
USt-IdNr.: DE 126 666 632

Commerzbank AG Herne-Wanne
(BLZ 430 400 36) Konto-Nr. 246 666 100
SWIFT COBA DE FF 432
IBAN: DE84 4304 0036 0246 6661 00

Deutsche Bank AG Bochum
(BLZ 430 700 61) Konto-Nr. 1 720 58000
SWIFT DEUT DEDE 430
IBAN: DE94 4307 0061 0172 0580 00

Dresdner Bank AG Herne-Wanne
(BLZ 360 800 80) Konto-Nr. 8 822 232 00
SWIFT DRES DE FF 432
IBAN: DE45 3608 0080 0882 2232 00

Landesbank Rheinland-Pfalz
(BLZ 550 500 00) Konto-Nr. 110 136 728
SWIFT MALADE 55550
IBAN: DE41 5505 0000 0110 1367 28



3.  All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

4.  SAI shall pay to the Company an upfront fee of 1,5 % calculated on the principal amount, due on the date of signing of the Shareholder Loan.

5.  SAI shall repay the Shareholder Loan in full in one amount 18 (eighteen) months after the date of the draw down.

This commitment letter shall be, and the loan document for the Shareholder Loan will be stated to be, construed in accordance with and governed by the law of the Federal Republic of Germany. The Company and SAI recognize that, until the proceeding with respect to SAI in the U.S. Bankruptcy Court for the District of Minnesota (the "SAI Bankruptcy Proceeding") has terminated, any action or proceeding arising out of or relating to this commitment letter or the loan document for the Shareholder Loan will be subject to the exclusive jurisdiction of the U.S. Bankruptcy Court for the District of Minnesota. The loan document for the Shareholder Loan will provide that SAI submits, effective as of the termination of the SAI Bankruptcy Proceeding, to the non-exclusive jurisdiction of the courts in Bochum, Federal Republic of Germany, in any action of proceeding arising out of or relating to the Shareholder Loan.

Very truly yours,

Schwing GmbH

Name: _Werner Dilly_

Title: _Fully Authorized Representative_

Accepted and agreed on [Date / Place]

Schwing America, Inc.   4/26/10

Name: _Brian Mogensen_

Title: _CFO_

**Annex I – Bank's Commitment Letter** [to be enclosed]

From: The undersigned Lenders

To:     Schwing GmbH
        Heerstr. 9-27
        44653 Herne

Attention:  Mr. Gerhard Schwing

**EUR 17,000,000**
**COMMITMENT LETTER**

Ladies and Gentlemen:

     We understand that Schwing America, Inc., a Minnesota corporation ("SAI") and a wholly owned subsidiary of Schwing GmbH (the "Company"), is currently being restructured pursuant to Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case") pending in the United States Bankruptcy Court, District of Minnesota (the "Court"). The Company has advised that SAI is in need of funding to implement a plan of reorganization and satisfy the claims of its secured creditors in connection therewith.

     Each of the undersigned (each, a "Lender" and, collectively, the "Lenders"), is pleased to inform the Company of such Lender's commitment to provide the Company on a secured basis with a bilateral term loan facility in the amount adjacent to such Lender's name as set forth on Annex I, third column headed "Commitment" attached hereto (the "Facilities"), subject to the terms and conditions of this letter and Annex II attached hereto (collectively this "Commitment Letter"). The proceeds of the Facilities shall be used to fund SAI's plan of reorganization (the "Chapter 11 Plan"). This will provide for, among other things, the Facilities, together with cash available to SAI, to be used for the payment in full of the secured obligations owing to Wells Fargo Bank, National Association ("Wells Fargo") and Bank of America, National Association ("Bank of America" and, together with Wells Fargo, the "SAI Secured Creditors") by a loan to SAI by the Company of like amount, in form acceptable to the Lenders (the "Shareholder Loan").

     Section 1.  <u>Conditions Precedent</u>. Each Lender's commitment hereunder is subject to: (i) the preparation, execution and delivery of mutually acceptable bilateral loan documentation (including the Shareholder Loan) incorporating substantially the terms and conditions outlined in this Commitment Letter (the "Operative Documents"); (ii) the absence of (A) any material adverse change in the business, condition (financial or otherwise), operations or prospects of the Company, SAI or any of its operating subsidiaries since February, 2010 and (B) any materially adverse circumstance, change or condition (including the continuation of any existing condition) in United States or Germany (or in the financial or capital markets of the United States or Germany) or in the market for loans or to debt securities of United States or German issuers; (iii) the accuracy and completeness of all representations that the Company makes to such Lender and all information that the Company furnishes to such Lender; (iv) the Company's compliance with the terms of this Commitment Letter, including, without limitation, the payment in full of all fees, expenses and other amounts payable under this Commitment Letter; (v) the submission by the Company of a business plan reasonably satisfactory to such Lender; (vi) the Bankruptcy Case neither being dismissed nor converted to a proceeding under Chapter 7 of the United States Bankruptcy Code; (vii) entry of a final order by the Court confirming the Chapter 11 Plan, which plan must be reasonably satisfactory to each Lender and shall provide for, among other things, (W) the

satisfaction of SAI Secured Creditors' claims, (X) the treatment of the unsecured obligations of SAI and (Y) arrangements sufficient to subordinate all intercompany obligations of SAI (other than the new Shareholder Loan) to the repayment of the Shareholder Loan and the Guarantee; and (viii) the occurrence of the effective date of the Chapter 11 Plan and (ix) the Company not being unable to meet its then due payment obligations (*zahlungsunfähig*) or deemed unable to meet its future payment obligations (*drohend zahlungsunfähig*) and no application for the opening of insolvency proceedings having been filed with respect to the Company.

Section 2.  Commitment Termination.  Each Lender's commitment hereunder will terminate on the earlier of (a) the date the bilateral loan agreement with that Lender is signed and (b) 30 June 2010 (unless extended by agreement with all Lenders).  Before such date, each Lender (subject to the prior consent of each other Lender) may terminate its commitment hereunder if any event occurs or information becomes available that, in its judgment, results or is likely to result in the failure to satisfy any condition set forth in Section 1.

Section 3.  [Intentionally Omitted]

Section 4.  Indemnification.  The Company shall indemnify and hold harmless each Lender and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), in each case arising out of or in connection with or by reason of this Commitment Letter or the Operative Documents or the transactions contemplated hereby or thereby or any actual or proposed use of the proceeds of the Facilities, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Company, any of its directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

No Indemnified Party shall have any liability (whether in contract, tort or otherwise) to the Company or any of its security holders or creditors for or in connection with the transactions contemplated hereby, except to the extent such liability is determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnified Party's gross negligence or willful misconduct.  In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings).

Section 5.  Costs and Expenses.  The Company shall pay, or reimburse each Lender on demand for, all out-of-pocket costs and expenses incurred by each Lender (whether incurred before or after the date hereof) in connection with the Facilities and the preparation, negotiation, execution and delivery of this Commitment Letter, including, without limitation, the reasonable fees and expenses of legal counsel and other professional advisers, regardless of whether any of the transactions contemplated hereby are consummated.  The Company shall also pay all costs and expenses of each Lender (including, without limitation, fees and disbursements of legal counsel and other professional advisers) incurred in connection with the enforcement of any of its rights and remedies hereunder.

Section 6.  <u>Representations and Warranties of the Company</u>.  The Company represents and warrants that (i) all information that has been or will hereafter be made available to each Lender by the Company, SAI or any of their respective representatives in connection with the transactions contemplated hereby is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements were or are made and (ii) all financial projections, if any, that have been or will be prepared by the Company or SAI, as applicable, and made available to any Lender have been or will be prepared in good faith based upon reasonable assumptions (it being understood that such projections are subject to significant uncertainties and contingencies, many of which are beyond the Company's and/or SAI's control, as applicable, and that no assurance can be given that the projections will be realized).  The Company agrees to supplement the information and projections from time to time until the Operative Documents become effective so that the representations and warranties contained in this paragraph remain correct.

In providing this Commitment Letter, each Lender is relying on the accuracy of the information furnished to it by or on behalf of the Company and its affiliates without independent verification thereof.

Section 7.  <u>No Third Party Reliance, Etc.</u>  The agreements of each Lender hereunder that issues a commitment to provide financing under the Facilities are made solely for the benefit of the Company and may not be relied upon or enforced by any other person.  Please note that those matters that are not covered or made clear herein are subject to mutual agreement of the parties.  The Company may not assign or delegate any of its rights or obligations hereunder without each Lender's prior written consent.  This Commitment Letter may not be amended or modified, or any provision hereof waived, except by a written agreement signed by all parties hereto.

The Company hereby acknowledges that each Lender is acting pursuant to a contractual relationship on an arm's length basis, and the parties hereto do not intend that any Lender act or be responsible as a fiduciary to the Company, its management, stockholders, creditors or any other person.  Each of the Company and each Lender hereby expressly disclaims any fiduciary relationship and agrees they are each responsible for making their own independent judgments with respect to any transactions entered into between them.  The Company also hereby acknowledges that no Lender has advised nor is advising the Company as to any legal, accounting, regulatory or tax matters, and that the Company is consulting its own advisors concerning such matters to the extent it deems appropriate.

The Company acknowledges that each Lender and/or one or more of such Lender's affiliates may provide financing, equity capital, financial advisory and/or other services to parties whose interests may conflict with the Company's interests.  Consistent with each Lender's policy to hold in confidence the affairs of its customers, no Lender nor any of its affiliates will furnish confidential information obtained from the Company to any of such Lender's other customers.  Furthermore, no Lender nor any of its affiliates will make available to the Company confidential information that such Lender obtained or may obtain from any other person.

Section 8.  <u>Governing Law, Etc.</u>  This Commitment Letter shall be governed by, and construed in accordance with, the law of the State of New York.  This Commitment Letter sets forth the entire agreement between the parties with respect to the matters addressed herein and supersedes all prior communications, written or oral, with respect hereto.  This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Commitment Letter.  Delivery of an executed counterpart of a signature page to this Commitment Letter by telecopier shall be as effective as delivery of an original executed counterpart of this Commitment Letter.  Sections 3 through 7 and 9 through 12

hereof shall survive the termination of each Lender's commitment hereunder. The Company acknowledges that information and documents relating to the Facilities may be transmitted through Intralinks, the internet or similar electronic transmission systems.

Section 9. <u>Payments</u>. To the fullest extent permitted by law, the Company shall make all payments hereunder regardless of any defense or counterclaim, including, without limitation, any defense or counterclaim based on any law, rule or policy which is now or hereafter promulgated by any governmental authority or regulatory body and which may adversely affect the Company's obligation to make, or the right of any Lender to receive, such payments.

Section 10. <u>Consent to Jurisdiction, Etc.</u> The Company hereby irrevocably and unconditionally (i) submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Commitment Letter, (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in any such New York State court or, to the extent permitted by law, in such Federal court, (iii) waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, (iv) consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to CT Corporation at 111 Eighth Avenue, New York, NY 10011, United States of America, or in any other manner permitted by applicable law, and (v) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Commitment Letter will affect any Lender's right to serve legal process in any other manner permitted by law or affect such Lender's right to bring any action or proceeding relating to this Commitment Letter or the transactions contemplated hereby against the Company or its property in the courts of any jurisdiction.

To the extent that the Company has or hereafter may acquire any immunity from jurisdiction of any court or from set-off or any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Company hereby irrevocably waives such immunity in respect of its obligations under this Commitment Letter.

Section 11. <u>Waiver of Jury Trial</u>. Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter or the transactions contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.

Section 12. <u>Patriot Act Compliance</u>. Each Lender hereby notifies you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Company, which information includes the name and address of the Company and other information that will allow such Lender to identify the Company in accordance with the Patriot Act. In that connection, each Lender may also request corporate formation documents, or other forms of identification, to verify information provided.

Section 13. <u>Nature of Commitment</u>. Each Lender's commitment hereunder is several and not joint.

Please indicate the Company's acceptance of the provisions hereof by signing the enclosed copy of this Commitment Letter and returning them to Jürgen Frölich, Landesbank Baden-Württemberg, (fax: +49 (0)711 124 48 160), with a copy to Christian Thüsing, Deutsche Bank AG, (fax: +49 (0)211 883

2355) at or before 4 p.m. (Düsseldorf time) on 23 April 2010, the time at which each Lender's commitment hereunder (if not so accepted prior thereto) will terminate. If the Company elects to deliver this Commitment Letter by telecopier, please arrange for the executed original to follow by next-day courier.

Very truly yours,

DEUTSCHE BANK AG

By: _____
    Name: Gelou: ermann    Seibüchler
    Title: Authorized Signatory

RHEINLAND-PFALZ BANK, UNSELBSTSTÄNDIGE ANSTALT DER LANDESBANK BADEN-WÜRTTEMBERG

By: _____
    Name:
    Title: Authorized Signatory

LANDESBANK BADEN-WÜRTTEMBERG

By: _____
    Name:
    Title: Authorized Signatory

ERSTE BANK DER OESTERREICHISCHEN SPARKASSEN AG

By: _____
    Name:
    Title: Authorized Signatory

2355) at or before 4 p.m. (Düsseldorf time) on 23 April 2010, the time at which each Lender's commitment hereunder (if not so accepted prior thereto) will terminate. If the Company elects to deliver this Commitment Letter by telecopier, please arrange for the executed original to follow by next-day courier.

Very truly yours,

DEUTSCHE BANK AG

By: _____
    Name:
    Title: Authorized Signatory

RHEINLAND-PFALZ BANK, UNSELBSTSTÄNDIGE ANSTALT DER LANDESBANK BADEN-WÜRTTEMBERG

By: _____
    Name: Bernd Hornung
    Title: Authorized Signatory

LANDESBANK BADEN-WÜRTTEMBERG

By: _____
    Name: Bernd Hornung
    Title: Authorized Signatory

ERSTE BANK DER OESTERREICHISCHEN SPARKASSEN AG

By: _____
    Name:
    Title: Authorized Signatory

2355) at or before 4 p.m. (Düsseldorf time) on 23 April 2010, the time at which each Lender's commitment hereunder (if not so accepted prior thereto) will terminate. If the Company elects to deliver this Commitment Letter by telecopier, please arrange for the executed original to follow by next-day courier.

Very truly yours,

DEUTSCHE BANK AG

By: _____
     Name:
     Title: Authorized Signatory

RHEINLAND-PFALZ BANK, UNSELBSTSTÄNDIGE ANSTALT DER LANDESBANK BADEN-WÜRTTEMBERG

By: _____
     Name:
     Title: Authorized Signatory

LANDESBANK BADEN-WÜRTTEMBERG

By: _____
     Name:
     Title: Authorized Signatory

ERSTE BANK DER OESTERREICHISCHEN SPARKASSEN AG

By: _____
     Name:
     Title: Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____

    Name:

    Title: Authorized Signatory

WESTLB AG

By: _____

    Name:

    Title: Authorized Signatory

COMMERZBANK AG

By: _____

    Name:

    Title: Authorized Signatory

WGZ BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____

    Name:

    Title: Authorized Signatory

DEUTSCHE POSTBANK AG

By: _____

    Name:

    Title: Authorized Signatory

HERNER SPARKASSE

By: _____

    Name:

    Title: Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____
    Name:
    Title: Authorized Signatory

WESTLB AG

By: _____
    Name: Tolksdorf    Gesmies
    Title: Authorized Signatory

COMMERZBANK AG

By: _____
    Name:
    Title: Authorized Signatory

WGZ BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____
    Name:
    Title: Authorized Signatory

DEUTSCHE POSTBANK AG

By: _____
    Name:
    Title: Authorized Signatory

HERNER SPARKASSE

By: _____
    Name:
    Title: Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____
    Name:
    Title:  Authorized Signatory

WESTLB AG

By: _____
    Name:
    Title:  Authorized Signatory

COMMERZBANK AG

By: _____
    Name:  Ralph Herzog
    Title:  Authorized Signatory    P. Jenson

WGZ  BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____
    Name:
    Title:  Authorized Signatory

DEUTSCHE POSTBANK AG

By: _____
    Name:
    Title:  Authorized Signatory

HERNER SPARKASSE

By: _____
    Name:
    Title:  Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____
    Name:
    Title: Authorized Signatory


WESTLB AG

By: _____
    Name:
    Title: Authorized Signatory


COMMERZBANK AG

By: _____
    Name:
    Title: Authorized Signatory


WGZ BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____
    Name: Häbig       Pohlmeyer
    Title: Authorized Signatory


DEUTSCHE POSTBANK AG

By: _____
    Name:
    Title: Authorized Signatory


HERNER SPARKASSE

By: _____
    Name:
    Title: Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____
    Name:
    Title: Authorized Signatory

WESTLB AG

By: _____
    Name:
    Title: Authorized Signatory

COMMERZBANK AG

By: _____
    Name:
    Title: Authorized Signatory

WGZ BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____
    Name:
    Title: Authorized Signatory

DEUTSCHE POSTBANK AG

By: _____
    Name:
    Title: Authorized Signatory

HERNER SPARKASSE

By: _____
    Name:
    Title: Authorized Signatory

UNICREDIT BANK AUSTRIA AG

By: _____
    Name:
    Title: Authorized Signatory

WESTLB AG

By: _____
    Name:
    Title: Authorized Signatory

COMMERZBANK AG

By: _____
    Name:
    Title: Authorized Signatory

WGZ  BANK AG WESTDEUTSCHE
GENOSSENSCHAFTS-ZENTRALBANK

By: _____
    Name:
    Title: Authorized Signatory

DEUTSCHE POSTBANK AG

By: _____
    Name:
    Title: Authorized Signatory

HERNER SPARKASSE

By: _____
    Name: Waffel        Striegan
    Title: Authorized Signatory

ACCEPTED AND AGREED
on April 23, 2010:

SCHWING GMBH

By: _____

    Name:

    Title:

## Annex I

### Lenders and Commitments

| Lender | Pro rata share (%) | Commitment (EUR) | Pro rata benefit (*Haftungsentlastung*) from Austrian Guarantees (EUR) |
|---|---|---|---|
| LBBW/RPB | 32.24 | 5,480,000 | 890,000 |
| Commerzbank AG | 14.53 | 2,470,000 | 400,000 |
| Erste Bank der oesterreichischen Sparkassen AG* | 10.45 | 1,780,000 | 290,000 |
| UniCredit Bank Austria AG* | 9.92 | 1,690,000 | 270,000 |
| WestLB | 9.92 | 1,690,000 | 270,000 |
| Deutsche Postbank AG | 6.80 | 1,160,000 | 190,000 |
| WGZ | 5.61 | 950,000 | 160,000 |
| Deutsche Bank AG | 5.50 | 930,000 | 150,000 |
| Herner Sparkasse | 5.03 | 850,000 | 140,000 |
| Total | 100,00 | 17,000,000 | 2,760,000 |

GERMANY-1123351-v7

41-40458891

\* Erste Bank der oesterreichischen Sparkassen AG and UniCredit Bank Austria AG are each entitled to increase their loan to Schwing GmbH by the amount of their guarantee commitment and thus in lieu of their guarantee commitment which shall be cancelled. In this case, the commitment of each other Lender and their pro rata share of the other Austrian Guarantees shall be reduced accordingly.

## Annex 2

### Summary of Terms and Conditions of each Facility

**I.    Parties**

|  |  |
|---|---|
| Borrower: | Schwing GmbH (the "<u>Borrower</u>"). |
| Guarantor | Schwing America, Inc. (the <u>Guarantor</u>") |
| Obligors | Borrower and Guarantor |
| Lenders: | Bilateral agreements with each of the banks and financial institutions listed in Annex I. |

**II.    Credit Facility**

| | |
|---|---|
| Type and Amount of Facility: | Term facility (the "<u>Facility</u>") in the amount set forth next to such Lender's name on Annex I. |
| Availability: | The Facility shall be available during the period commencing on the Closing Date and ending on 30 June 2010 or such earlier date as the Facility may be terminated as a result of an event of default (*Kündigungsgrund*). |
| Maturity: | 30 September 2010, unless each Lender agrees, at its sole discretion (*freies Ermessen*) to extend such maturity in the context of an agreement on the overall refinancing of Schwing group. |
| Purpose: | The proceeds of the Facilities shall be used to fund SAI's plan of reorganization the ("<u>Chapter 11 Plan</u>"). This will provide for, among other things, the use of the Facilities (together with cash available to SAI) to fund the payment in full of the secured obligations owing to Wells Fargo Bank, National Association and Bank of America, National Association (collectively, the "<u>SAI Secured Creditors</u>") by a loan to SAI by the Company of like amount, in form acceptable to the Lenders (the "<u>Shareholder Loan</u>") The Shareholder Loan shall provide that to the extent of any payment with respect to or satisfaction of the Guarantee referenced below, the Shareholder Loan shall be reduced by any such amount. |

III.    **Certain Payment Provisions**

Fees and Interest Rates:                   As set forth on Schedule 1.


IV.    **Credit Support**                        The Facilities shall be secured by a first priority
                                               lien on and security interest in (i) 100% of the
                                               equity interests in the Guarantor, (ii) all of the
                                               Borrower's rights under the Shareholder Loan and
                                               (iii) assignment of all claims in case of a sale of
                                               SAI.

                                               The Guarantor will enter into a New York law
                                               governed guarantee agreement (the "Guarantee")
                                               pursuant to which it will guarantee all of the
                                               obligations of the Borrower under each Facility.

                                               The obligations of the Guarantor under the
                                               Guarantee be secured by a first priority lien on and
                                               security interests in all of the assets of the
                                               Guarantor, including, without limitation, real
                                               property, patents and trade receivables.

                                               The documents evidencing the liens and security
                                               interests granted in favor of the Lenders to secure
                                               the Guarantee are herein referred to as the
                                               "Security Documents".

                                               Suretyship (*selbstschuldnerische Bürgschaft*) of
                                               Mr. Gerhard Schwing over EUR 3,400,000 (ie
                                               equal to 20% of the Facilities), to be reduced pro
                                               rata upon repayment of the Facilities. This
                                               suretyship is in addition to the suretyship over EUR
                                               4,000,000 provided in the context of the pooling
                                               agreement dated 27 July 2009, which will remain
                                               in place.


V.    **Certain Conditions**

Initial Conditions:                         The availability of the Facilities shall be
                                               conditioned upon satisfaction of, among other
                                               things, the following conditions precedent (the date
                                               upon which all such conditions precedent shall be
                                               satisfied, the "Closing Date") on or before 30 June
                                               2010, in each case in form and substance
                                               satisfactory to each Lender:

                                               (a) Each Obligor shall have executed and
                                                    delivered satisfactory definitive financing
                                                    documentation to which it is a party with

respect to each Facility, including, without limitation, the Security Documents, the Guarantee and an addendum to the existing security pooling agreement dated 27 July 2009 (the "Finance Documents").

(b) Execution of the (German law governed) Shareholder Loan, with the Shareholder Loan to reflect the terms of payments for principal and interest due under the Facilities.

(c) The Lenders shall have received all fees required to be paid, and all expenses for which invoices have been presented, on or before the Closing Date.

(d) All governmental and third party approvals necessary or, in the discretion of the Lenders, advisable in connection with the financing contemplated hereby and the continuing operations of each Obligor and its subsidiaries shall have been obtained and be in full force and effect.

(e) Copy of the KPMG evaluation of the final Chapter 11 Plan.

(f) The Lenders shall have received such legal opinions, documents and other instruments as are customary for transactions of this type or as they may reasonably request.

(g) The filing with the Bankruptcy Court of the Chapter 11 Plan, which plan shall provide for, among other things, (i) the satisfaction of the SAI Secured Creditors' claims, (ii) the treatment of the unsecured obligations of the Guarantor, and (iii) the treatment of the intercompany obligations of the Guarantor (other than the Shareholder Loan) vis-à-vis the claims of its general unsecured creditors.

(h) The Bankruptcy Court shall have entered a final order confirming the Chapter 11 Plan.

(i) The effective date of the Chapter 11 Plan shall have occurred.

(j) No acceleration under any of the existing loans to Schwing GmbH set out in Schedule 2.

(k) The Borrower's performance as envisaged in

the German Restructuring Opinion (*Sanierungsgutachten*).

(l) Lenders to benefit in the amounts set out in Annex I from Bank guaranties (the "<u>Austrian Bank Guarantees</u>") over an aggregate amount of EUR 2,760,000 to be provided by the following banks financing Schwing GmbH St. Stefan:

| Bank | Amount (EUR) |
|------|--------------|
| Bank für Kärnten und Steuermark | 1,337,000 |
| Erste Bank | 679,000 |
| Unicredit AG | 419,000 |
| Raiffeisenlandesb ank Kärnten | 263,000 |
| Raiffeisenbank St. Stefan | 62,000 |

provided that Erste Bank and Unicredit shall be entitled instead and at its choice to provide a bilateral loan in such amount to Schwing GmbH on the terms set out in this Commitment Letter in which case no such bank guarantee is required.

(m) Evidence that the security agent has appointed an experienced service provider, who has accepted such appointment, at the costs of SAI to monitor locally performance by SAI under certain of the Security Documents and regularly value the security made available by SAI under such Security Documents.

(n) Implementation of a chief restructuring officer at SAI in consultation with KPMG.

(o) Installation of a monthly controlling at SAI by KPMG, with a focus on reduction of inventory, use of cashflow (*Mittelverwendung*) and determination of sustainable free cashflow.

(p) Confirmation by the State of Northrhein-Westfalia (*Vorvalutierungserklärung*) as part of the application for a state guarantee in an amount corresponding to 80 % of the Facilities.

(q) Evidence of hedging of exchange rate risk arising as a result of the Facilities being made

available in Euro while amounts due to the SAI Secured Creditors are in US dollars.

(r) Evidence that the Company has available to it under the bilateral facilities funds in a total amount of EUR 17,000,000 and that thus funds, together with cash available to SAI, are sufficient to discharge the SAI Secured Creditors in full.

## VI. Certain Documentation Matters

The Finance Documents shall contain representations, warranties, information requirements, financial covenants and other undertakings, events of default, yield protection and provisions relation to the assignment and transfer of the Lender's rights and/or obligations with respect to each Obligor customary for financings of this type and other terms deemed appropriate by each Lender, including (without limitation) as affirmative covenants the following:

(a) taking appropriate measures to ensure stand-alone financing of SAI, eg. through a sale-and-lease back of the property or new inventory financing, to be reported on as part of monthly reporting provided by KPMG;

(b) provided that there is no event of default (*Kündigungsgrund*) under any Facility, use of sustainable free cashflow of SAI (calculation to be agreed but to include proceeds from any stand-alone financing, for the avoidance of doubt, sustainable free cashflow will be calculated after the payments due to the unsecured creditors of SAI as envisaged in the Chapter 11 Plan) as determined by KPMG to prepay creditors pro rata as follows:

(1) 70% to repay the Shareholder Loan and trade receivables owing to Schwing GmbH, of which 50% will be used to prepay the Shareholder Loan and, thereafter, the Facilities *pro rata*; and

(2) 30% to repay obligations owing to Schwing GmbH St. Stefan arising from delivery of goods and services.

The Guarantee shall contain representations, warranties, covenants and events of default with respect to the Guarantor customary for loan

documentation governed by NY law and provisions otherwise deemed appropriate by the Lenders, including, without limitation:

Financial reporting, projections, maintenance of property and insurance; maintenance of books and records; inspection rights; restrictions on payments to affiliates other than as specified, indebtedness, liens, asset sales, investments, and sale and leasebacks; defaults in payments and cross-defaults.

Governing Law: Germany.
Forum: Appropriate court in Germany.

<u>Schedule 1</u>

<u>Interest and Certain Fees</u>

Interest Rate:      Subject to adjustments by each Lender in case of a change of the base interest rate (*Basiszinssatz*), 8 per cent. per annum, payable monthly in arrears.

Commitment Fee:      On the available undrawn amount equal to 3 per cent. per annum, payable monthly in arrears.

Rate and Fee Basis:      All per annum rates shall be calculated on the basis of a year of 360 days for actual days elapsed.

Upfront Fee:      1.5 per cent on the amount of each Facility, due on the date of signing of the respective facility agreement.

<u>Schedule 2</u>

<u>a) Existing short-term cash-/letter of credit - and bills of exchange credit lines</u>

| Bank / type of credit | Amount |
|---|---|
| **Rheinland-Pfalz Bank** | |
| Cash loan | EUR 25,000,000.00 |
| | |
| **Deutsche Bank AG** | |
| Cash-/discount loan | EUR 9,000,000.00 |
| letter of credit facility | EUR 2,000,000.00 |
| | |
| **Erste Bank der oesterreichischen Sparkassen AG** | |
| Cash loan | EUR 10,500,000.00 |
| | |
| **UniCredit Bank Austria AG** | |
| Cash loan | EUR 5,000,000.00 |
| | |
| **WestLB AG** | |
| Cash loan | EUR 10,000,000.00 |
| | |
| **Commerzbank AG** | |
| Cash loan Commerzbank | EUR 4,500,000.00 |
| Cash loan Dresdner Bank | EUR 6,000,000.00 |
| Letter of credit facility | EUR 3,000,000.00 |
| Discount loan | EUR 5,000,000.00 |
| | |
| **WGZ BANK AG** | |
| **Westdeutsche Genossenschafts-Zentralbank** | |
| Cash-hybrid loan | EUR 6,000,000.00 |
| | |
| **Deutsche Postbank AG** | |
| Cash loan | EUR 7,500,000.00 |
| | |
| **Herner Sparkasse** | |
| Cash loan | EUR 4,090,000.00 |
| Letter of credit facility | EUR 150,000.00 |
| Discount loan | EUR 2,000,000.00 |

<u>b) Existing mid-/long-term syndicated loan</u>

| | |
|---|---|
| **Rheinland-Pfalz Bank** | |
| Syndicated loan | EUR 12,500,000.00 |
| | |
| **Erste Bank der oesterreichischen Sparkassen AG** | |
| Syndicated loan | EUR 10,000,000.00 |

**UniCredit Bank Austria AG**
Syndicated loan                                    EUR 10,000,000.00

**Commerzbank AG**
Syndicated loan                                    EUR 10,000,000.00

**WGZ BANK AG**
**Westdeutsche Genossenschafts-Zentralbank**
Syndicated loan                                    EUR  5,000,000.00

**Herner Sparkasse**
Syndicated loan                                    EUR  2,500,000.00


c) Existing mid-/long-term loan

**WestLB AG**
Loan                                               EUR  5,000,000.00

**Deutsche Postbank AG**
Loan                                               EUR  1,400,000.00

**Herner Sparkasse**
Loan                                               EUR    465,824.59


d) Existing promissory note

**Landesbank Baden-Württemberg**
Promissory note                                    EUR  4,000,000.00

**UniCredit Bank Austria AG**
Schuldscheindarlehen                               EUR  5,000,000.00

**ING Bank N,V,, Niederlassung Frankfurt**
Promissory note (terminated)                       EUR  3,500,000.00

**Deutsche Postbank AG**
Promissory note                                    EUR  5,000,000.00

**Herner Sparkasse**
Schuldscheindarlehen                               EUR  1,000,000.00

**WestLB AG**
Promissory note                                    EUR  5,000,000.00


e) New credit lines/additional cash loans

**Rheinland-Pfalz Bank**
Additional cash loan                                EUR  4,940,000.00

**Deutsche Bank AG**
Additional cash loan                                EUR  1,178,000.00

**Erste Bank der oesterreichischen Sparkassen
AG**
Additional cash loan                                EUR  2,660,000.00

**UniCredit Bank Austria AG**
Additional cash loan                                EUR  1,976,000.00

**WestLB AG**
Additional cash loan                                EUR  1,976,000.00

**Commerzbank AG**
Additional cash loan Commerzbank                    EUR  2,717,000.00
Additional cash loan Dresdner Bank                  EUR  1,000,000.00

**WGZ Bank AG**
**Westdeutsche Genossenschafts-Zentralbank**
Additional cash loan                                EUR  1,444,000.00

**Deutsche Postbank AG**
Additional cash loan                                EUR  1,178,000.00

**Herner Sparkasse**
Additional cash loan                                EUR    931,000.00


f) New credit lines/additional working capital lines

**Rheinland-Pfalz Bank**
Additional working capital loan                     EUR 25,000,000.00

# EXHIBIT 3

**Schwing America Inc.**
Income Statement - Forecast
**FY 2010 - 2012 Forecast**
(includes actuals for Jan+Feb)

| | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|
| 1500 BPA | $12,443,988 | | 15,554,985 | | 15,554,985 | |
| 2000 BPL | 26,942,498 | | 45,802,246 | | 59,542,919 | |
| 3000 Mixers | 2,100,270 | | 4,200,540 | | 6,300,810 | |
| 3500 Parts | 26,634,733 | | 31,961,680 | | 35,157,848 | |
| 4500 Service (hours x $115) | 620,065 | | 837,088 | | 962,651 | |
| 5000 Warranty | (606,598) | | (1,213,195) | | (1,819,793) | |
| 5500 SPB | 3,264,601 | | 4,080,751 | | 4,080,751 | |
| 6000 Training | 8,100 | | | | | |
| 6500 Trucks | 5,873,650 | | 9,985,205 | 21.8% | 12,980,767 | 21.8% |
| 7000 Used Equip. | 11,147,071 | | 4,458,828 | | 4,458,828 | |
| 7500 Miscellaneous | 1,993,434 | 7.5% | 2,392,120 | 7.5% | 2,631,332 | 7.5% |
| * Gross Sales | **$90,421,812** | 107.8% | **$ 118,060,248** | 140.7% | **$ 139,851,099** | 166.7% |
| 1500 BPA | $ - | | | | | |
| 2000 BPL | 604,119 | 2.3% | 1,027,002 | 2.3% | 1,335,103 | 2.3% |
| 3000 Mixers | - | | | | | |
| 3500 Parts | 5,660,838 | 21.3% | 6,793,006 | 21.3% | 7,472,306 | 21.3% |
| 4500 Service | 8,178 | 1.3% | 11,040 | 1.3% | 12,696 | 1.3% |
| 5000 Warranty | 198,113 | -32.7% | 396,226 | -32.7% | 594,339 | -32.7% |
| 5500 SPB | - | | | | | |
| 6000 Training | - | | | | | |
| 6500 Trucks | - | | | | | |
| 7500 Miscellaneous | 39,834 | 0.05% | 41,045 | 0.05% | 41,045 | 0.05% |
| * Sales Deductions | **$ 6,511,082** | 7.8% | **$ 8,268,320** | 9.9% | **$ 9,455,490** | 11.3% |
| 1500 BPA | 12,443,988 | 14.8% | 15,554,985 | 18.5% | 15,554,985 | 18.5% |
| 2000 BPL | 26,338,378 | 31.4% | 44,775,243 | 53.4% | 58,207,816 | 69.4% |
| 3000 Mixers | 2,100,270 | 2.5% | 4,200,540 | 5.3% | 6,300,810 | 7.5% |
| 3500 Parts | 20,973,895 | 25.0% | 25,168,674 | 30.0% | 27,685,541 | 33.0% |
| 4500 Service | 611,887 | 0.7% | 826,047 | 1.0% | 949,955 | 1.1% |
| 5000 Warranty | (804,710) | -1.0% | (1,609,421) | -1.9% | (2,414,131) | -2.9% |
| 5500 SPB | 3,264,601 | 3.9% | 4,080,751 | 4.9% | 4,080,751 | 4.9% |
| 6000 Training | 8,100 | 0.0% | - | | | |
| 6500 Trucks | 5,873,650 | 7.0% | 9,985,205 | 11.9% | 12,980,767 | 15.5% |
| 7000 Used Equip. | 11,107,237 | 13.2% | 4,458,828 | 5.3% | 4,458,828 | 5.3% |
| 7500 Miscellaneous | 1,993,434 | 2.4% | 2,351,075 | 2.8% | 2,590,287 | 3.1% |
| ** Net Sales | **$83,910,730** | 100.0% | **$ 109,791,929** | 130.8% | **$ 130,395,609** | 155.4% |

***COGS ***
*** BPL, BPA, SPB, Service ***

| | 2010 | | 2011 | | 2012 | |
|---|---|---|---|---|---|---|
| Stock Units | $19,178,037 | | | | | |
| Contract Units | 9,520,025 | | | | | |
| Material on BOM | 9,136,499 | | | | | |
| Outside Services on Routing | 302,563 | 85.2% | 54,171,631 | 78.0% | 65,917,785 | 77.5% |
| Direct Labor (actuals = labor from stock produced) | 665,924 | 1.5% | 957,124 | 1.4% | 1,165,124 | 1.4% |
| Direct Overhead (actuals = overhead from stock produced) | 40,957 | 0.1% | | | | |
| Wages Indirect - Hourly | 238,884 | 0.5% | 280,484 | 0.4% | 340,290 | 0.4% |
| Wages Indirect - Salaried | 1,208,732 | 2.7% | 1,208,732 | 1.7% | 1,208,732 | 1.4% |
| Taxes & Benefits | 528,518 | 1.2% | 636,048 | 0.9% | 771,669 | 0.9% |
| Workers Compensation | 204,223 | 0.5% | 244,634 | 0.4% | 296,796 | 0.3% |
| Other Spending | 1,467,246 | 3.3% | 2,057,973 | 3.0% | 2,570,902 | 3.0% |
| COGS Savings | (100,845) | -0.2% | (100,845) | -0.1% | (100,845) | -0.1% |
| Internal Costs | 1,529,783 | 3.4% | 1,456,380 | 2.1% | 1,729,686 | 2.0% |
| Labor & Overhead Absorbed (from Actual results) | (286,329) | -0.6% | | 0.0% | | 0.0% |
| Net Labor & Overhead | 5,497,091 | 12.3% | | 0.0% | | 0.0% |
| * Direct COGS | **$43,634,214** | 97.5% | **$ 60,912,159** | 87.7% | **$ 73,900,138** | 86.8% |
| | | Margin % | | Margin % | | Margin % |
| Parts | 12,101,999 | 42.0% | 14,451,853 | 42.6% | 15,738,067 | 43.2% |
| Warranty | (350,406) | 56.5% | (700,812) | 56.5% | (1,051,217) | 56.5% |
| Trucks | 6,200,951 | -5.6% | 8,960,374 | 10.3% | 11,648,486 | 10.3% |

| | | | | | | |
|---|---:|---:|---:|---:|---:|---:|
| Used Equipment | 10,176,633 | 8.4% | 4,085,252 | 8.4% | 4,085,252 | 8.4% |
| Miscellaneous | 1,314,841 | 34.0% | 1,550,736 | 34.0% | 1,708,517 | 34.0% |
| *       Other COGS | $29,444,018 | | $ 28,347,402 | | $ 32,129,104 | |
| | | | | | | |
| Material Variances / Obsolenscence | 1,082,754 | 1.3% | 1,000,000 | 0.9% | 1,000,000 | 0.8% |
| | | | | | | |
| **     Total Cost of Sales | $74,160,986 | 88.4% | $ 90,259,562 | 82.2% | $107,029,243 | 82.1% |
| | | | | | | |
| ***     Gross Profit | $ 9,749,744 | 11.6% | $ 19,532,367 | 17.8% | $ 23,366,366 | 17.9% |
| | | | | | | |
| ** SG&A ** | | | | | | |
| SAI Wages Salaried | 5,250,097 | 6.3% | 5,209,392 | 4.7% | 6,186,992 | 4.7% |
| SAI Wages Hourly | 596,537 | 0.7% | 591,912 | 0.5% | 702,990 | 0.5% |
| SAI Taxes & Benefits | 1,542,983 | 1.8% | 1,508,339 | 1.4% | 1,791,396 | 1.4% |
| SAI WC/401K | 243,250 | 0.3% | 133,430 | 0.1% | 158,470 | 0.1% |
| SAI Other Spending | 11,934,722 | 14.2% | 8,286,258 | 7.5% | 9,841,267 | 7.5% |
| SAI SGA Savings | (3,715,353) | -4.4% | | | | |
| SAI Internal Costs | (1,467,760) | -1.7% | (1,456,380) | -1.3% | (1,729,686) | -1.3% |
| Total Non Headcount Spending | 6,751,609 | 8.0% | 6,829,878 | 6.2% | 8,111,581 | 6.2% |
| *       Total SG&A | $14,384,475 | 17.1% | $ 14,272,951 | 13.0% | $ 16,951,429 | 13.0% |
| | | | | | | |
| ****     Income from Opns | $ (4,634,731) | -5.5% | $ 5,259,416 | 4.8% | $ 6,414,937 | 5.8% |
| | | | | | | |
| Other Income/Expense INTERCO INTEREST | $ 1,220,932 | 1.5% | $ 1,215,500 | 1.1% | $ 1,215,500 | 0.9% |
| DEBT SERVICE | $ 2,381,513 | 2.8% | $ 1,760,000 | 1.6% | $ 1,760,000 | 1.3% |
| UNREALIZED CURRENCY (GAIN) LOSS & OTHER | $ (998,096) | -1.2% | $ - | | $ - | |
| | | | | | | |
| *****     Income B/Tax | $ (7,239,080) | -8.6% | $ 2,283,916 | 2.1% | $ 3,439,437 | 2.6% |
| | | | | | | |
| Income Tax Expense | $ 4,148 | 0.0% | $ 913,567 | 0.8% | $ 1,375,775 | 1.1% |
| | | | | | | |
| ******  Net Income | $ (7,243,228) | -8.6% | $ 1,370,350 | 1.2% | $ 2,063,662 | 1.6% |

# Schwing America, Inc. and Subsidiaries

2010 Balance Sheet Forecast

| | **2010** | **2011** | **2012** |
|---|---|---|---|
| **Assets** | | | |
| Current Assets: | | | |
| Cash and cash equivalents | $ 20,361,545 | $ 18,848,971 | $ 17,051,550 |
| Accounts Receivable - Trade | 2,191,953 | 2,320,771 | 2,427,899 |
| Accounts Receivable - Affiliates | 1,256,448 | 1,256,448 | 1,256,448 |
| Accounts Receivable - Related | 8,366,914 | 7,366,914 | 6,366,914 |
| Net, Accounts receivable | 11,815,316 | 10,944,133 | 10,051,262 |
| Raw Material | 18,774,661 | 23,709,722 | 28,212,015 |
| WIP | 17,180,090 | 17,180,090 | 17,180,090 |
| Inventory - Finished | 586,346 | 586,346 | 586,346 |
| Inventory - Used | 4,285,014 | 4,285,014 | 4,285,014 |
| Inventory | 40,826,110 | 45,761,171 | 50,263,464 |
| Prepaid expenses | 1,237,621 | 1,237,621 | 1,237,621 |
| Other Current Assets | 1,433,991 | 1,433,991 | 1,433,991 |
| **Total Current Assets** | **75,674,583** | **78,225,888** | **80,037,888** |
| Property and equipment, net | 12,931,679 | 11,509,679 | 11,451,560 |
| Investments | - | - | - |
| Intangibles, net | 180,399 | 180,399 | 180,399 |
| **Total Non Current Assets** | **13,112,078** | **11,690,078** | **11,631,959** |
| **Total assets** | **$ 88,786,661** | **$ 89,915,966** | **$ 91,669,847** |
| **Liabilities and Shareholder's Equity** | | | |
| Current liabilities: | | | |
| Current Maturities of LTD - WBL | $ (243,739) | $ (243,739) | $ (243,739) |
| Short Term Loans | - | - | - |
| Current maturities of long-term debt | - | - | - |
| Accounts payable - trade | (4,439,712) | (4,275,921) | (4,004,768) |
| Accounts payable - affiliates | (28,885,156) | (28,885,156) | (28,885,156) |
| Accounts payable - related | (523,032) | (523,032) | (523,032) |
| Accrued taxes | (800,688) | (800,688) | (800,688) |
| Accrued expenses | (7,106,308) | (7,029,054) | (6,990,427) |
| Deferred revenue | (518,513) | (518,513) | (518,513) |
| Notes payable to parent | (22,100,000) | (22,100,000) | (22,100,000) |
| Other Current Liabilities | (603,313) | (603,313) | (603,313) |
| **Total Current Liabilities** | **$ (65,220,462)** | **$ (64,979,417)** | **$ (64,669,636)** |
| Non Current Liabilities | | | |
| Deferred Tax Liability | - | - | - |
| LTD - Other | (22,000,000) | (22,000,000) | (22,000,000) |
| Notes payable to parent | - | - | - |
| **Total Non Current Liabilities** | **$ (22,000,000)** | **$ (22,000,000)** | **$ (22,000,000)** |
| **Total Liabilities** | **$ (87,220,462)** | **$ (86,979,417)** | **$ (86,669,636)** |
| Stockholder's equity: | | | |
| Common stock, no par value. Authorized 2,500 shares; | | | |
| issued and outstanding 100 shares | (60,000) | (60,000) | (60,000) |
| Additional paid-in capital | (24,655,572) | (24,655,572) | (24,655,572) |
| Prior Year Retained Earnings | 15,954,953 | 23,149,372 | 21,779,022 |
| Current Year (Profit)/Loss | 7,194,419 | (1,370,350) | (2,063,662) |
| Retained earnings | 23,149,372 | 21,779,022 | 19,715,360 |
| **Total shareholder's equity** | **(1,566,200)** | **(2,936,549)** | **(5,000,212)** |
| Commitments and contingencies | | | |
| **Total liabilities and shareholder's equity** | **$ (88,786,662)** | **$ (89,915,966)** | **$ (91,669,848)** |

# Schwing America, Inc. and Subsidiaries

2010 Cash Flow Statement Forecast

| | 2010 | 2011 | 2012 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | ($7,194,418) | $1,370,350 | $2,063,662 |
| Adjustments to reconcile net income to net cash | | | |
| provided by operating activities: | | | |
| Depreciation and amortization | 1,981,301 | 1,707,000 | 1,533,119 |
| Deferred income taxes | 0 | 0 | 0 |
| Gain on sale of fixed assets | (10,109) | 0 | 0 |
| Bad debt expense | 659,703 | 420,000 | 0 |
| Impairment of intangible assets | 0 | 0 | 0 |
| Change in operating assets and liabilities: | | | |
| Accounts receivable | (1,385,431) | (548,818) | (107,128) |
| Accounts receivable – affiliates & related | (105,495) | 1,000,000 | 1,000,000 |
| Inventory | 28,494,203 | (4,935,061) | (4,502,293) |
| Income and sales tax refund receivable | 0 | 0 | 0 |
| Prepaid expenses | (854,720) | 0 | 0 |
| Cost and estimated earnings in excess of billings | 0 | 0 | 0 |
| Other assets | (83,716) | 0 | 0 |
| Accounts payable – trade | (1,040,006) | (163,791) | (271,154) |
| Accounts payable – affiliates | (1,377,140) | 0 | 0 |
| Accrued expenses and Other | 830,568 | (77,254) | (38,627) |
| Income taxes payable | 398 | 0 | 0 |
| Deferred revenue | (94,601) | 0 | 0 |
| Net cash provided by operating activities | $19,820,537 | ($1,227,574) | ($322,421) |
| Cash flows from investing activities: | | | |
| Purchase of property and equipment | (12,899) | (285,000) | (1,475,000) |
| Proceeds from sale of fixed assets | 34,515 | 0 | 0 |
| Net cash used in investing activities | $21,616 | ($285,000) | ($1,475,000) |
| Cash flows from financing activities: | | | |
| Proceeds from long or short-term debt | 22,000,000 | 0 | 0 |
| Payment of long or short-term debt | (27,887,493) | 0 | 0 |
| Proceeds (Payment) of notes payable to parent | 0 | 0 | 0 |
| Payments of obligations under capital lease | (27,483) | 0 | 0 |
| Proceeds from Paid in Capital | 0 | 0 | 0 |
| Net cash used in financing activities | ($5,914,976) | $0 | $0 |
| Net decrease in cash and cash equivalents | 13,927,177 | (1,512,574) | (1,797,421) |
| Cash and cash equivalents at beginning of month | 6,434,368 | 20,361,545 | 18,848,971 |
| Cash and cash equivalents at end of month | $20,361,545 | $18,848,971 | $17,051,550 |

# Schwing America Plan of Reorganization

All Amounts in 000's
100%
24 Months
Cash Out

| | | Outstanding Balance | 1 Jul-10 | 2 Aug-10 | 3 Sep-10 | 4 Oct-10 | 5 Nov-10 | 6 Dec-10 | 7 Jan-11 | 8 Feb-11 | 9 Mar-11 | 10 Apr-11 | 11 May-11 | 12 Jun-11 | 13-18 Jul-11 - Dec-11 | 19-24 Jan-12 - Jun-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Month Number | | | | | | | | | | | | | | | |
| **Cash From Operations** | | | | | | | | | | | | | | | | |
| (1) | Net Income From Budget Version # 19 | | 3,008.7 | 3,581.2 | 3,065.9 | 3,716.3 | 1,858.7 | 2,795.1 | 61.9 | 61.9 | 61.9 | 88.2 | 88.2 | 88.2 | 919.9 | 1,031.8 |
| (2) | Cash Provided by Operating Activities | | (204.4) | | | (290.7) | (151.1) | (311.6) | (383.2) | (383.2) | (383.2) | (383.2) | (383.2) | (132.2) | (799.0) | (1,193.0) |
| (3) | Cash Outflows for Capital Expenditures | | | | | | | | | | | (61.7) | (61.7) | (61.7) | (100.0) | (737.6) |
| (4) | Add Back Interest Expense from Below | | 480.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 146.7 | 880.0 | 880.0 |
| | Add Back "In Plan" Monthly Payment Plans | | 655.4 | 211.8 | 211.8 | 211.8 | 208.9 | 208.9 | 208.9 | 208.9 | 208.9 | 208.9 | 208.9 | 208.9 | 1,241.7 | 1,241.7 |
| | Cash From Operations | | 3,596.8 | 3,755.3 | 3,186.2 | 3,784.0 | 2,061.2 | 2,838.1 | 32.4 | 32.4 | 282.4 | (3.0) | (3.0) | 247.0 | 2,142.6 | 1,223.0 |
| **Uses of Cash** | | | | | | | | | | | | | | | | |
| | Chapter 11 Administrative Claims | $325.0 | ($325.0) | | | | | | | | | | | | | |
| | Schwing GmbH Loan | $1,000.0 | ($1,000.0) | | | | | | | | | | | | | |
| | Cure Payments | $126.0 | ($126.0) | | | | | | | | | | | | | |
| | Class 1 - Priority Non-Tax Claims | $284.7 | ($284.7) | | | | | | | | | | | | | |
| | Class 2A - Secured Lenders | $15,643.4 / ($16,171.4) | ($16,171.4) | | | | | | | | | | | | | |
| | Class 2B - De Lage Landen Financial | | | | | | | | | | | | | | | |
| |   Revolver RE | $22.1 | ($3.1) | ($3.1) | ($3.1) | ($3.1) | | | | | | | | | | |
| |   Pre-Petition | $6.7 | ($1.7) | ($1.7) | ($1.7) | ($1.7) | | | | | | | | | | |
| | Class 3 - Convenience Class Claims | $33.0 | ($33.0) | | | | | | | | | | | | | |
| | Class 3 - Unsecured Third Party | $6,662.7 | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($2,165.7) | ($2,165.7) |
| | Class 4 - Unsecured Insider Claims | $52,601.0 | | | | | | | | | | | | | | |
| |   Intercompany | | ($23,049.2) | | | | | | | | | | | | | |
| | Sub-Total | $84,876.0 | ($23,949.2) | ($365.8) | ($365.8) | ($365.8) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($2,165.7) | ($2,165.7) |
| **Sources of Cash** | | | | | | | | | | | | | | | | |
| (5) | Cash | $4,893.3 | | | | | | | | | | | | | | |
| (6) | Allowance for Potential Sales Softness | -$2,638.3 | | | | | | | | | | | | | | |
| | European Bank Financing | $22,000.0 | $22,000.0 | | | | | | | | | | | | | |
| |   Interest   Euro Amount €17,000.0   8.0% | | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($146.7) | ($880.0) | ($880.0) |
| |   Loan Initiation Fee   1.5% | | ($334.1) | $334.1 | | | | | | | | | | | | |
| |   Exchange Rate   1.310 | | | | | | | | | | | | | | | |
| | Sub-Total | $24,255.0 | $23,774.3 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $2,165.7 | $880.0 |
| **Cash Position Roll-Forward** | | | | | | | | | | | | | | | | |
| | Beginning Cash Balance | $24,256.0 | $0.0 | $2,421.9 | $4,644.8 | $6,318.6 | $8,590.1 | $9,143.7 | $10,474.2 | $10,582.3 | $10,690.4 | $11,048.5 | $11,121.3 | $11,194.0 | $11,516.7 | $10,613.7 |
| | Cash From Operations | | $3,596.8 | $3,755.3 | $3,186.2 | $3,784.0 | $2,061.2 | $2,838.1 | $32.4 | $32.4 | $282.4 | ($3.0) | ($3.0) | $247.0 | $2,142.6 | $1,223.0 |
| | Uses of Cash | | ($23,949.2) | ($365.8) | ($365.8) | ($365.8) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($360.9) | ($2,165.7) | ($2,165.7) |
| | Sources of Cash | | $23,774.3 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $146.7 | $2,165.7 | $880.0 |
| (7) | Allowance for Potential Sales Softness | | ($1,000.0) | ($1,000.0) | ($1,000.0) | ($1,000.0) | ($1,000.0) | ($1,000.0) | | | | | | | | |
| | Ending Cash Balance | | $2,421.9 | $4,644.8 | $6,318.6 | $8,590.1 | $9,143.7 | $10,474.2 | $10,582.3 | $10,690.4 | $11,048.5 | $11,121.3 | $11,194.0 | $11,516.7 | $10,613.7 | $8,791.0 |

Class 2C - Nuss Truck Group: Total Claim $665.9

Payments to Nuss Truck Group will occur in normal course of business as chassis are sold and these payments are included in calculation of Net Income above.

Notes:

(1) Net Income includes I/C interest expense of $0.6 million in July - Dec 2010 and $0.6 million in Jan - Jun 2011.

(2) $10 million of used pump sales included in "Cash Provided by Operating Activities" for Jul - Dec 2010 ($1.667 million per month).

(3) Net Income includes External Interest Expense which is also shown in the Sources of Cash Section so in order to not double count this expense it was added back here.

(4) Operating Activities includes some Priority and some Non-Priority Payment Plans which is also shown in the Uses of Cash Section so in order to not double count the cash flow it was added back here.

(5) Cash Balance of $4.9 million includes the $1 million note from Schwing GmbH and $6 million repaid to Secured Lenders.

(6) Assumes a potential sales softness from the date of plan submission to date of plan confirmation of agromomany $2.6 million.

(7) Allowance for potentially missed sales of $1 million per month during the last half of 2010. Of the $6 million of lost sales, $3.5 million comes from sales of BPLs which will then occur in the first half of 2011.

# EXHIBIT 4
## LIQUIDATION ANALYSIS

|  | Estimated Value as of 3/31/2010 |
|---|---|
| New Inventory | $18,720,000.00 |
| Used Inventory | $9,709,000.70 |
| WIP/Raw Material | $11,002,000.00 |
| Accounts Receivable | $1,793,000.00 |
| Deutsche Leasing Chassis<br>I-State / Twin Cities Mack<br>Chassis | $2,529,000.00 |
| Equipment | $1,631,000.00 |
| Cash | $6,515,000.40 |
| Real Estate | $10,000,000.00 |
| Total: | $61,899,001.10 |

| | | |
|---|---|---|
| Less: Cost of sale | ($5,100,000.00) | |
| Net Proceeds | | $56,800,100.00 |

Payments:

| | |
|---|---|
| Wells Fargo / Bank of America | ($28,315,000.00) |
| Other Secured Creditors | ($270,000.00) |
| Administrative Expenses | ($500,000.00) |
| Repay Schwing GmbH Loan | ($1,000,000.00) |

| | |
|---|---|
| Net available for<br>Unsecured Creditors | $26,715,100.00 |
| Total Unsecured Claims | $61,300,000.00 |
| Percentage of Claims Paid | 43.60% |